# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-1199

_____

United States of America,

           Appellee,

v.

Guy Randy White Horse,

           Appellant.

\* \* \* \* \* \* \* \* \* \*

Appeal from the United States
District Court for the District
of South Dakota.

_____

Submitted: October 8, 2002

Filed: January 15, 2003

_____

Before HANSEN, Chief Judge, and HEANEY and MORRIS SHEPPARD ARNOLD, Circuit Judges.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

Guy Randy White Horse appeals his conviction in federal district court[1] for sexually molesting his six-year-old son. For the reasons explained below, we affirm.

_____

[1]The Honorable Karen E. Schreier, United States District Judge for the District of South Dakota.

## I.

Mr. White Horse maintains first that his indictment was so fatally flawed as to deprive the district court that tried him of jurisdiction. Mr. White Horse was indicted for aggravated sexual abuse under 18 U.S.C. §§ 2241(c) and 1152. The first statute defines aggravated sexual abuse, and the latter statute provides that "the general laws of the United States as to the punishment of offenses ... shall extend to the Indian country [but] [t]his section shall not extend to offenses committed by one Indian against the person or property of another Indian." Mr. White Horse contends that § 1152 creates federal jurisdiction over all federal crimes by non-Indians against Indians in Indian country but excludes jurisdiction over crimes by one Indian against another. He asserts that he is in fact an Indian and argues that the district court therefore had no jurisdiction over his case.

Contrary to Mr. White Horse's argument, the fact, if it is one, that Mr. White Horse is an Indian would not deprive the district court of jurisdiction to try him for a violation of § 1152. It might have been a relevant matter at trial, but the trial court had the power to try the case whatever Mr. White Horse's status was. As the Supreme Court has recently made clear, the matter of jurisdiction has to do only with " 'the court's statutory or constitutional *power* to adjudicate the case,' " *United States v. Cotton*, 122 S. Ct. 1781, 1785 (2002) (quoting *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 89 (1998)). As Judge Easterbrook succinctly observed, "[s]ubject-matter jurisdiction in every federal criminal prosecution comes from 18 U.S.C. § 3231 ... That's the beginning and the end of the 'jurisdictional' inquiry." *Hugi v. United States*, 164 F.3d 378, 380 (7th Cir. 1999). Mr. White Horse's assertion that he is an Indian is relevant to the matter of proof but irrelevant on the matter of jurisdiction.

## II.

Although he did not raise his Indian status at the trial court level, Mr. White Horse now argues that the government's proof was insufficient because non-Indian

status is an element of the offense under § 1152, and the government never proved that he was not an Indian. The government, on the other hand, maintains that Indian status is an affirmative defense to a charge under § 1152 and that Mr. White Horse did not produce any evidence at trial that he qualifies as an Indian under the principles outlined in *Rogers v. United States*, 45 U.S. (4 How.) 567, 572-73 (1846). Even if one were to assume his Indian status, the government contends that the error was not prejudicial because 18 U.S.C. § 1153 criminalizes the very acts charged in the indictment in any event: That statute provides that "[a]ny Indian who commits against the person or property of another Indian ... any of the following offenses, [including incest and an assault against an individual who has not attained the age of 16 years] ... shall be subject to the same law and penalties as all other persons." 18 U.S.C. § 1153(a).

If non-Indian status is an element of the offense of § 1152, we would proceed to analyze Mr. White Horse's conviction under §§ 2241(c) and 1152 for plain error, and we would notice an error not raised at trial only if it is plain, "affect[s] substantial rights [and] seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Cotton*, 122 S. Ct. at 1786 (internal quotations omitted). If, however, Indian status is an affirmative defense to a charge under § 1152, Mr. White Horse cannot prevail because he did not raise the defense in the trial court. *Cf. Clark v. Martinez*, 295 F.3d 809, 815 (8th Cir. 2002).

Even if a defendant's Indian status is an element of the offense under § 1152, we conclude that Mr. White Horse is not entitled to plain error relief because of the complementary nature of § 1152 and § 1153. There is no contention that the evidence was insufficient to establish that Mr. White Horse committed the physical acts charged in the indictment, and regardless of which statute applied (one of them certainly did) Mr. White Horse was guilty of a federal crime because he, like everyone else, is either an Indian or he is not. Between them, the statutes apply to all defendants whatever their race or ethnicity. In other words, we believe that the

situation here is the same as it would be if we were dealing not with two statutes but with a single one that provided that it applied whether or not the defendant was an Indian. Indeed, as they pertain to the crime of aggravated sexual abuse, the two relevant sections could have been codified as one to render ethnic or racial status altogether irrelevant. In the circumstances, therefore, we cannot say that Mr. White Horse's conviction seriously affected the fairness, integrity, or public reputation of judicial proceedings.

Furthermore, Mr. White Horse has not indicated that his strategy at trial would have changed if he had been charged under § 1153. Because he has suffered no prejudice from the fact that he might have been charged and convicted under the wrong statutory section, he cannot be entitled to plain error relief. *See United States v. Vallie*, 284 F.3d 917, 921 (8th Cir. 2002).

III.

Mr. White Horse next maintains that the district court abused its discretion in failing to compel the government to provide him with a copy of a forensic report prepared by a social worker and with a copy of videotaped interviews involving the social worker and his son. We review rulings on pretrial motions for production for an abuse of discretion, and we will reverse "only on a showing that the error was prejudicial to the substantial rights of the defendant." *See United States v. Woosley*, 761 F.2d 445, 448 (8th Cir. 1985).

The district court denied Mr. White Horse's motion to compel production of these copies on the grounds that a forensic examination did not constitute a "physical or mental examination[]" under Fed. R. Crim. P. 16(a)(1)(D) and because the government did not intend to call the social worker as an expert at trial. The district court noted, however, that both the report and videotaped interview were covered by the Jencks Act, 18 U.S.C. § 3500: Thus, if either the son or the social worker testified, production of the videotape would be required after the testimony; and if the

-4-

social worker was called as an expert, production of the report would be required thereafter as well. The district court also advised Mr. White Horse to file a motion *in limine* should he wish to raise any issue about the particulars of any statement that the government might seek to introduce under the residual hearsay exception, *see* Fed. R. Evid. 807.

We detect no prejudice here even if the court's ruling was erroneous. The record indicates that Mr. White Horse and his counsel were allowed to see a copy of the videotaped interviews in a private area of the jail where Mr. White Horse was detained, and Mr. White Horse obtained a copy of the social worker's report from a source other than the government at least a month prior to trial. Thus the failure to compel production of copies did not affect his substantial rights.

Mr. White Horse cites *United States v. Davis*, 244 F.3d 666 (8th Cir. 2001), for the proposition that "[d]elayed disclosure is inconsistent with the discovery obligations set forth in Rule 16," which are designed in part to " 'provid[e] the defendant with sufficient information upon which to base' " a litigation strategy. *Id.* at 673 n.4 (quoting Fed. R. Crim. P. 16 advisory committee's note). *Davis*, however, materially differs from the instant case. In that case, the district court excluded the government's use of DNA evidence as a discovery sanction because the "government waited until almost a month after the discovery deadline to request expedited testing and did not notify the district court or the defense about the DNA testing or the possibility of a delay until two days before trial was scheduled to begin." *Id.* at 673. That clearly is not the situation here, since defense counsel had access to the requisite materials well in advance of trial.

Mr. White Horse also argues that his failure to obtain a copy of the report and videotape violated his confrontation clause rights. Although his son testified at trial, he argues that his ability to cross-examine his son and the social worker was rendered ineffective because he was not provided with the particulars of statements by his son

that were introduced under Rule 807 during the social worker's testimony. We disagree. As noted before, Mr. White Horse had obtained a copy of the report and had witnessed the videotaped interviews. Because he knew the particulars of his son's statements, he had the opportunity to cross-examine both his son and the social worker effectively. *Cf. United States v. Wilson*, 102 F.3d 968, 971-72 (8th Cir. 1996).

IV.

Mr. White Horse next argues that his trial rights under the Speedy Trial Act (18 U.S.C. § 3161) and under the Sixth Amendment were violated because his trial occurred about nine and one-half months after the date of his arraignment. We disagree. Mr. White Horse waived his statutory rights under the Speedy Trial Act by failing to make a pretrial motion for dismissal on speedy trial grounds. *United States v. Kime*, 99 F.3d 870, 881 (8th Cir. 1997), *cert. denied*, 519 U.S. 1141, 520 U.S. 1220 (1997). His Sixth Amendment claim also lacks merit. In order for his constitutional claim to prevail, the interval between accusation and trial must be "presumptively prejudicial." *Doggett v. United States*, 505 U.S. 647, 651-52 (1992). We conclude that a nine and one-half month interval is too short to be presumptively prejudicial. *Cf. United States v. Sprouts*, 282 F.3d 1037, 1042-43 (8th Cir. 2002); *United States v. Moss*, 217 F.3d 426, 431-32 (6th Cir. 2000); *Cowart v. Hargett*, 16 F.3d 642, 646-47 (5th Cir. 1994), *cert. denied*, 513 U.S. 886 (1994).

V.

Mr. White Horse asserts that the district court abused its discretion by granting the government's motion to exclude a psychologist's testimony that Mr. White Horse did not have a sexual interest in underage boys. In preparing for his testimony, the psychologist interviewed Mr. White Horse, administered a mental status examination to him, and attempted to ascertain his sexual interests by means of what is called an Abel Assessment. The district court gave detailed reasons for concluding that the Abel Assessment was neither scientifically valid nor a good fit for the specific facts of the case, and it determined that Mr. White Horse's statements during the clinical

interview and mental status examination would constitute hearsay. *See United States v. White Horse*, 177 F. Supp. 2d 973 (D.S.D. 2001).

The Abel Assessment comprises two parts. Part I measures the amount of time that a subject views slides of clothed and partially clothed people, premised on the belief that a correlation exists between sexual response and the length of time spent viewing sexual stimuli. It also includes a questionnaire that is designed to detect the subject's sexual behavior, as well as to ascertain the subject's willingness to admit to experiencing common social problems (as a kind of "lie scale"). In part II of the Abel Assessment, the results from this questionnaire are combined with the viewing time results to create a score. Part II subjects this score to three predictive equations in order to predict the likelihood that the subject is sexually interested in children under fourteen and that he would lie about his interest.

Under *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993), the admissibility of expert testimony relying on scientific reasoning or methodology under Fed. R. Evid. 702 depends on "whether the reasoning or methodology underlying the testimony is scientifically valid and [on] whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93. We agree with the district court that there are significant concerns about how well each part of the Abel Assessment "fits" the facts at issue in the instant case. *Cf. Smith v. Rasmussen*, 249 F.3d 755, 758-59 (8th Cir. 2001). For instance, there is not any evidence that part I had been tested with a statistically significant sample of Native Americans, and none of the slides contained any pictures of Native American adults or children. *White Horse*, 177 F. Supp. 2d at 975. And, as pertains to part II, Dr. Abel's 2001 published study stated that incest-only cases (such as the alleged offense here) were excluded from the testing of two of the three predictive equations "because incest offenders often act for reasons other than sexual interest." *Id.* at 976. We thus conclude that the district court did not err in holding that the Abel Assessment was not admissible under Rule 702.

We also do not believe that the clinical interview and mental status examination could have formed an independent basis for the psychologist's expert opinion. As the psychologist explained at the *Daubert* hearing, he did not form any conclusions based on the clinical interview and mental status examination, "nor would [he] normally expect to," as they only served as a starting point for further lines of inquiry.

The district court correctly concluded, moreover, that the statements that Mr. White Horse made during the clinical interview and mental status examination were not independently admissible, because they were hearsay. *See United States v. Waters*, 194 F.3d 926, 931 (8th Cir. 1999).

VI.

Mr. White Horse next argues that the district court abused its discretion in denying his request to present evidence of what he called prosecutorial misconduct to the jury. In particular, Mr. White Horse sought to introduce evidence that before trial the prosecutor took Mr. White Horse's son to the courtroom where the trial was to occur and told him "that's where the bad man sits; where the guy going to prison is going to sit." Mr. White Horse argues that this biased his son against him. The prosecutor disputed Mr. White Horse's account of the relevant events.

After considering Mr. White Horse's offer of proof and the testimony of an FBI agent who witnessed the trial preparation (and confirmed the prosecutor's account), the district court did not allow Mr. White Horse to present evidence of the prosecutor's alleged conduct, since the matter was "extraneous" and disputed. The district court noted that when Mr. White Horse's son testified he clearly indicated that he loved his father.

We will reverse on the basis of an evidentiary ruling only when it "affects the substantial rights of the defendant or when ... the error has had more than a slight

influence on the verdict." *United States v. Ballew*, 40 F.3d 936, 941 (8th Cir. 1994), *cert. denied*, 514 U.S. 1091 (1995). We have previously held that the trial court retains wide discretion to exclude evidence that would result in a "collateral mini-trial" because both sides characterize the event at issue differently. *See United States v. Waloke*, 962 F.2d 824, 830 (8th Cir. 1992). Even if we were to assume that the evidentiary ruling was improper, and we do not think that it was, we do not believe that Mr. White Horse's substantial rights have been affected, because he was still able to challenge his son's credibility when his son testified. Nor do we think that the error, if any, influenced the verdict. *Cf. United States v. Kirkie*, 261 F.3d 761, 767 (8th Cir. 2001).

## VII.

During its deliberations, the jury sent the district court four questions, one of which is at issue here. The question read: "Reference photo of basement: Exhibit 101. Is this a completely accurate crime scene picture? Or is this a picture taken many days after the alleged incident. Testimony conflicts with this picture." The trial court responded: "Exhibit 101 was not taken on the day of the alleged incident. You should use your recollection of the testimony to determine whether this photo accurately depicts the crime scene."

Although a district court "should answer a question from the jury in a way that is helpful and clears away any difficulties," *United States v. Felici*, 54 F.3d 504, 507 (8th Cir. 1995), *cert. denied*, 516 U.S. 897 (1995), it must be wary not to intrude on the fact-finding process. *See United States v. Warren*, 25 F.3d 890, 898 (9th Cir. 1994). In a criminal case, we think that it is especially important that a trial court not instruct a jury on the facts, even if they are not disputed, and the trial court's answer to the jury's question did so in this instance. We nevertheless can discern on this record no significant prejudice to Mr. White Horse from the court's error, and thus find it harmless.

VIII.

Accordingly, we affirm the judgment of the district court.

HEANEY, Circuit Judge, dissenting.

I respectfully dissent. The government and the district court were aware that White Horse is an Indian from the time the indictment was filed against him. At the pre-trial *Daubert* hearing, the district court referred to White Horse as a Native American, *U.S. v. White Horse*, 177 F. Supp.2d 973, 974 (D.S.D. 2001), and questioned the validity of the psychological methodology used to assess him because it had not been sufficiently tested with regard to Native American subjects. The presentence investigation report indicates that White Horse's race is American Indian, that he was raised on the Pine Ridge Indian Reservation, and that he practices Lakota traditions. While we have no way of confirming whether the government made a mistake by citing § 1152 rather than § 1153 in the indictment, there does not appear to be any other explanation for its failure to adequately identify White Horse's race. For these reasons, I cannot agree with the majority's determination that the government filed a constitutionally sufficient indictment.

The majority holds that White Horse's first claim fails in two ways: (1) if Indian status is an element of the offense, he loses under the plain-error analysis because the government's error did not result in prejudice; and (2) if Indian status is an affirmative defense to § 1152, White Horse loses again because he failed to raise the defense at the trial court level. Yet, both parties were aware that White Horse is an American Indian at trial, and the court was on notice of White Horse's race throughout all proceedings. The government does not have the liberty of ignoring the proper way of filing an indictment, particularly where there is sufficient evidence to show that it knew before trial that White Horse is an American Indian. Consequently, plain error analysis is an unsuitable means of reviewing the district court's decision.

I therefore believe that we have no other alternative than to vacate White Horse's conviction and remand the matter for a new trial under the appropriate statute.[2]

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

_____

[2]As an aside, little or no progress has been made by the United States Department of Interior, the Tribe, or any of the applicable federal or state agencies to reduce the incidence of sexual abuse on poverty-stricken Indian reservations. All interested agencies should consider alternative programs that will reduce the prevalence of this crime on South Dakota Indian reservations.